IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Hannah Corbin,

    Plaintiff,

v.

Steak n Shake, Inc., *et al.*,

    Defendants.

Case No: 2:17-cv-1043

Judge Graham

Magistrate Judge Deavers

<u>Opinion and Order</u>

Plaintiff Hannah Corbin brings this suit for hostile work environment, gender discrimination and retaliation against her former employer Steak n Shake, Inc. Corbin alleges that three coworkers sexually harassed her by making repeated comments about her body and that one of the coworkers made unwanted physical contact with her. She further alleges that the harassment was sufficiently severe and intolerable as to result in her constructive discharge.

This matter is before the court on Steak n Shake's motion for summary judgment. For the reasons set forth below, the court grants in part and denies in part the motion for summary judgment.

**I.    Background**

    **A.    Facts**

Hannah Corbin was 16 years old when she began working at a Steak n Shake restaurant in Newark, Ohio in mid-July 2015. <u>See</u> Corbin Dep. at 21; Morlen Aff. at ¶ 1. She worked as a server, and her job duties included greeting customers, taking orders, serving food and cleaning tables. <u>Id</u>. at 36-37. Corbin worked about 25 hours per week. She worked primarily on Fridays, Saturdays and Sundays, and sporadically on weekday evenings. <u>Id</u>. at 29-30.

Corbin was interviewed and hired by service manager Sean McLeish. <u>Id</u>. at 23. Defendant Michael Simon was the store's General Manager. Simon did not interact often with Corbin because he worked normal weekday shifts. <u>See</u> Simon Aff. at ¶ 5.

Corbin testified that she was subjected to sex-based comments right from the start of her employment. On the day of her interview, she was told by two male employees that McLeish liked to hire "pretty young females." Corbin Dep. at 40. She was told this by Will McCann and Robert

1

"Bubba" Travis, who held positions of hourly production associates.[1]  Id.; Simon Aff. at ¶¶ 8, 10.

McCann and Travis regularly made comments to Corbin during the course of her roughly eight-month period of employment at Steak n Shake.  According to Corbin, "Every day I would go in and they would make a new remark about my butt or my boobs or how thick I was. . . . They would make googly eyes . . . . [and] stare at me until I got out of sight."  Corbin Dep. at 40.  Corbin characterized this behavior as "never ending."  Id.  Corbin testified that a third coworker, Logan Brown, who was also an hourly production associate, would sometimes join in on the comments.  Id. at 113-14.

Corbin had a boyfriend and she hoped that telling McCann, Travis and Brown of him would cause them to stop their behavior, but it did not.  Id. at 40.  Upon finding out that Corbin's boyfriend was an African-American, they made comments about this too.  Referring to the black pants which employees had to wear, they said that they were "black from the waist down" and asked if this gave them a chance with Corbin.  Id. at 40-41, 114-15.  Corbin tried to "brush them off."  Id. at 46.  After they made such comments two or three times, Corbin told them that she would have her boyfriend come into the store; they then stopped making those types of race-based sexual comments.  Id. at 46.

In December 2015 and early 2016, McCann made physical contact with Corbin.  As Corbin described it, "Will started to smack my butt.  Like, I would walk by him through the back line, to get something.  And he would smack my butt and take his hand away so quick that I would just turn around and no one would be there."  Id. at 41.  This happened three to five times over the course of about a month.  Id. at 47.  On one occasion, McCann also rubbed Corbin's neck with his hands.  Id. at 41-42.  McCann ceased the physical contact after Corbin stated her intention to tell her boyfriend and parents.  Id. at 41.

Though the physical contact stopped, McCann and Travis continued making remarks to Corbin.  "[T]he comments, they were every day.  They would say something every time I walked by."  Id. at 42.  McCann and Travis also continued staring at her.  "They would be looking through the window, the food window, while I'm cleaning my tables.  And I would turn around and they would just be staring at me."  Id.

---

[1] The record does not contain a description of what job duties McCann and Travis performed as hourly production associates.  Based on Corbin's testimony that she would encounter the pair "in the kitchen" or "on the back line" and that she would see them through the food window, a fair inference is that McCann and Travis normally worked in the kitchen area.  See Corbin Dep. at 28, 41, 42, 45, 50, 66.

2

In March 2016, Corbin complained of the harassment by McCann and Travis to Simon. Corbin Dep. at 64-66; Dean Aff. at ¶ 10. Corbin does not recall exactly when she made her complaint but she does remember the situation in which it arose. As she was in the back of the store picking up cardboard, Simon and McCann came in and McCann said to Simon, "Isn't that a nice view?" Corbin Dep. at 65. Simon "nodded his head" and "proceeded on like it was no big deal." Id.

Corbin used this occasion to tell Simon of the verbal harassment she had received from McCann and Travis. Id. at 65-66. She told him that she did not like "how Will talk[ed]" to her and that McCann and Travis had made "sexual comments" to her.[2] Id at 66. According to Corbin, Simon did not believe her and said he "had no proof" of the harassment before him. Id. at 66, 74. Corbin told Simon that she wanted "to call corporate about it" since he would not resolve the problem. Id. at 66. This prompted Simon to provide her with the telephone number for the corporate hotline. Id.

The corporate hotline was one of the avenues identified in Steak n Shake's "Youth at Work Initiative" policy for reporting harassment or discrimination. Corbin Dep, Ex. B. The policy informed employees under 18 years old of their right to be free from harassment and discrimination at work and encouraged them and their parents to report such conduct immediately. This same policy, including the avenues for reporting, was repeated in Steak n Shake's Sexual Harassment Policy and its Associate Handbook. Id., Exs. C & D.

Corbin called the corporate hotline on either the same day she talked to Simon or the day after. Corbin Dep. at 66-67. She told the corporate representative that she had been subjected to sexual comments and that a coworker had "smack[ed] her butt." Id. at 67. According to Corbin, the representative stated that he would be in contact with her later, but she did not hear back from him. Id.

According to Steak n Shake, it has no record in its database that Corbin called the corporate hotline. See Sanders Aff. at ¶ 4. Further, Simon denies that Corbin reported the alleged harassment to him. See Simon Aff. at ¶ 17.

In mid-March 2016, Corbin notified Steak n Shake that she wanted to be taken off the work schedule. Corbin Dep. at 50-52; Simon Aff. at ¶ 11. She did this by submitting an electronic message to the store's internal messaging system stating that she was no longer to be placed on the schedule.

---

[2] Corbin did not expressly testify whether she told Simon at this point in time of the instances when McCann made physical contact with her. But her testimony supports an inference that she did because Corbin testified that when she was later discussing the harassment with Simon and another employee, Simon already knew about the touching. Corbin Dep. at 61.

3

Simon Aff. at ¶ 11. Her notice was accompanied by a request that she be placed on "pickup shift" status. Id. What Corbin meant by the request was that she would be available to cover for someone else who could not work their shift. Corbin Dep. at 51. If an employee needed someone to cover their shift, they could inform others through text message, an application on their electronic device called Hot Schedule, or the store's internal messaging system. Id. at 51-52; Simon Aff. at ¶ 11.

Corbin testified that, at the time she submitted her pickup shift request, she did not want to work at Steak n Shake anymore. Corbin Dep. at 51. She stated: "I didn't want to be completely without a job. But I didn't want to work there anymore. So I was trying to wean myself off." Id.

Simon interpreted Corbin's message concerning her work schedule as a resignation. Simon Aff. at ¶ 11 ("I took this message to mean that she was giving notice of her resignation and moving to pickup shift only status for the duration of the notice period."). He instructed the employee in charge of scheduling, Brandi Genzen, to remove Corbin from the schedule, and he entered a termination date of March 29, 2016 for Corbin into the human resources system. Id. at ¶¶ 12, 13.

On April 2, 2016, Corbin arrived at the store to work. Id. at ¶ 14. She had no intention of resigning on that day. Corbin Dep. at 62. She believed she was still on a regular shift and had a couple of days of regular shifts left before she was to go on pickup shift status. Id. at 54. Corbin attempted to swipe her card and clock in, but her card was not recognized. Id. She saw Simon in the kitchen and reported that her card was not working. Id. He was busy and directed her to talk to Genzen. Id. Genzen was the mother of Will McCann, but Corbin and Genzen had not previously seen or talked to each other. Id. at 42, 54-55.

Corbin went to see Genzen and things did not go well. Corbin believed Genzen had "something out for" her, and the two got into a confrontation about whether Corbin had resigned. Id. at 55. Genzen insisted that Corbin was not to be on the schedule anymore, while Corbin emphasized that she still wanted to do pickup shifts. Id. They retrieved messages from the internal messaging system and found one stating that Corbin "wants to be put on pickup only. Looking for another job." Id. at 56. Corbin agreed that the message accurately reflected what she had communicated, but Genzen accused her of being a "snooty little bitch" about it. Id. According to Corbin, Genzen became angry and made her feel threatened, saying, "Nobody messes with me, because I'll kill a [m____f___er]." Id. at 57. In tears, Corbin called her mother, Shannon Morlen, and asked her to come to the store. Id. at 58.

When Corbin's mother arrived, the two of them met with Simon and Genzen in an office in the back of the store. Both Corbin and her mother reported that Genzen's son, McCann, had touched

4

Corbin and made "inappropriate comments." Corbin Dep. at 61; Morlen Aff. at ¶ 6. According to Corbin, Simon already knew of these allegations but Genzen was "surprised" to hear of them. Corbin Dep. at 61. Corbin's mother "got into it" verbally with Genzen, saying words to the effect of, "Your son's been touching my daughter. . . . And you're his mother. What do you have out against her?", id. at 58-61, as well as, "It is your son who has been accused of sexual harassment and now you're threatening my daughter? That doesn't look good." Morlen Aff. at ¶ 6.

Corbin's mother expressed disbelief over the situation and said, "You guys obviously have something out for her. So she won't be returning." Corbin Dep. at 60. Simon offered to restore Corbin to the system so she could work yet that day. Id. at 62; Simon Aff. at ¶ 19. Corbin and her mother declined that offer. Corbin testified that "with what she [Genzen] had said to me I didn't want to work there." Corbin Dep. at 62. According to Corbin, her mother told Simon, "Not after this, she's not working here." Id. at 63.

After the meeting, Simon reported Corbin's complaint of sexual harassment to his District Manager and to Human Resources. Simon Aff. at ¶ 22. Steak n Shake conducted an investigation and interviewed numerous employees, including several who had worked with Corbin. Seikel Aff. at ¶ 6. Those who were interviewed stated that they had neither observed Corbin being harassed nor heard (prior to April 2) about Corbin's allegations. Doc. 26-4 at PAGEID 312-352. The investigation ended with Steak n Shake being unable to substantiate Corbin's allegations of sexual harassment. Seikel Aff. at ¶ 7.

### B. Plaintiff's Claims

Corbin filed this lawsuit against Steak n Shake and Michael Simon in his capacity as General Manager of the Newark store. The complaint alleges that Corbin was subjected to severe and pervasive sexual harassment and that she was constructively discharged because she had no choice but to resign her employment as a result of the harassment.

The complaint asserts three cause of action under Title VII of the Civil Rights Act: of 1964: (1) hostile work environment, (2) gender discrimination and (3) retaliation. 42 U.S.C. §§ 2000e-2, 2000e-3. The complaint also asserts parallel state law claims. O.R.C. § 4112.02.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586

F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

#### A. Hostile Work Environment

"A work environment is actionable under Title VII if the workplace is permeated with discriminatory intimidation, ridicule or insult sufficiently severe or pervasive to alter the conditions of employment." Waldo v. Consumers Energy Co., 726 F.3d 802, 813 (6th Cir. 2013) (internal quotation marks omitted). Ohio law follows suit with Title VII. O.R.C. § 4112.02(A); see also Smith v. Dep't

6

of Pub. Safety, 997 N.E.2d 597, 614 (Ohio Ct. App. 2013) ("Due to the similarities in Title VII and R.C. Chapter 4112, Ohio courts look to federal case law addressing Title VII for assistance in interpreting R.C. Chapter 4112.").

The elements of a hostile work environment claim are: (1) plaintiff belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on sex, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act. Williams v. CSX Transp. Co., 643 F.3d 502, 511 (6th Cir. 2011).

The first four elements are not in dispute for purposes of the motion for summary judgment. Corbin testified in her deposition that while she worked at Steak n Shake she was subjected to unwelcome sexual harassment, both verbal and physical. And defendants assume *arguendo* in their motion that the harassment was sufficiently severe or pervasive as to create an abusive working environment.

Defendants contend that plaintiff cannot meet the fifth element of her claim. In the context of coworker harassment, an employer is liable "when its negligence leads to the creation or continuation of a hostile work environment." Vance v. Ball State Univ., 570 U.S. 421, 446 (2013). A plaintiff must demonstrate "that the employer's response to the plaintiff's complaints manifested indifference or unreasonableness in light of the facts the employer knew or should have known." Waldo, 726 F.3d at 814 (internal quotation marks omitted). "Generally, a response is adequate if it is reasonably calculated to end the harassment." Jackson v. Quanex Corp., 191 F.3d 647, 663 (6th Cir. 1999).

Defendants deny that Corbin reported the alleged harassment prior to April 2, 2016, the final day she came to work. Simon claims he was unaware of the harassment until that day, and Steak n Shake claims to have no record of Corbin calling the corporate hotline.

The court, however, finds that a genuine issue of fact exists concerning when Corbin first complained of the harassment. Corbin testified that she informed Simon of the harassment sometime in March 2016. She says that McCann made a sexual remark about her to Simon, but Simon did not reprimand McCann. Corbin then told Simon of the harassment she had experienced from McCann and Travis. According to Corbin, Simon said that he could not "make any firing[s]" because there were "no cameras" in the store and "no proof" of the harassment. Corbin Dep. at 66. She said, "Well, I'm sitting here telling you this is happening. So I would like to call corporate about it if you

7

can't make any kind of resolution here." Id. Corbin then called the corporate hotline on the same day or next day and reported the sexual harassment.

Corbin testified that neither Simon nor Steak n Shake took any action to end the harassment. Plaintiff's evidence is unrebutted because defendants flatly deny they knew anything of the harassment until April 2. A jury thus could find that defendants failed to promptly investigate and remove the alleged harassers from Corbin's work environment. Generally, the "most significant immediate measure an employer can take" is to "launch a prompt investigation." Collette v. Stein–Mart, Inc., 126 Fed. App'x 678, 686 (6th Cir. 2005) (internal quotation marks omitted). Separating the alleged harasser from the victim pending an investigation is also often an important step. Id.; Fenton v. HiSAN, Inc., 174 F.3d 827, 830-31 (6th Cir. 1999) (employer moved alleged harasser's workstation).

Defendants argue that in any event Corbin stopped working before Steak n Shake had an opportunity to investigate. According to Steak n Shake, Corbin had already made up her mind that she was leaving her employment at Steak n Shake, submitted a notice of wanting to transfer to pickup shift status and then voluntarily resigned on April 2. Corbin in essence removed herself from the work environment for reasons unrelated to the harassment. Steak n Shake investigated her claims, though she had resigned, and found that they could not be substantiated.

The court finds that there are genuine issues of material fact concerning the timing and motivation of Corbin's request to be taken off the regular work schedule and be placed on pickup shifts. Corbin does not recall exactly when she submitted her notice to be removed from the regular work schedule. Corbin Dep. at 51. According to Simon, she did so in mid-March 2016. Simon Aff. at ¶ 11.

A jury could find that Corbin first complained of the harassment to Simon in early March.[3] If so, defendants would have been aware of the alleged harassment for about two weeks before they received her notice about the work schedule. A jury could find that defendants acted unreasonably by failing to investigate or take action to prevent further harassment during the period from when Corbin first complained until she stopped working.

---

[3] Corbin at one point testified that it might have been February or March 2016 when she first complained of the harassment to Simon. Corbin Dep. at 64. Plaintiff's brief takes the position that she reported it in March 2016. Plaintiff has submitted an affidavit of one of Corbin's coworkers, Maddie Dean, who states that Corbin reported the harassment to Simon in March 2016, see Dean Aff. at ¶ 10, but it is not apparent from the affidavit what basis or personal knowledge Dean has for her statement.

A jury could alternatively find that Corbin did not report the harassment until about the same time she submitted her notice to be taken off the work schedule. Even then, summary judgment must be denied. A jury could find both that Corbin wanted off the regular schedule because of the harassment and that defendants should have understood that to be the case and taken prompt remedial action. To be sure, Corbin's testimony as to her reason for not wanting to work at Steak n Shake any longer is vague. Corbin Dep. at 51 ("I didn't want to be completely without a job. But I didn't want to work there anymore."). But a jury could find that the harassment was the most likely motivating factor. Elsewhere in her deposition, Corbin seems to have related the harassment to her notice about the work schedule when she stated, "I mean, it [the harassment] just didn't ever stop. So, once it finally got to the whole [point of] me going on pickup shifts only is what I had sent my email in as, because I was going to start looking for another job . . . ." Id. at 42. If Corbin reported the harassment to Simon at or near the same time she notified him of her desire to stop working there, a jury could find that a reasonable supervisor would have made the connection between the two and ensured that Corbin could work her regular hours, free of harassment, pending an investigation.

Accordingly, the court finds that there are genuine issues of material fact which preclude summary judgment on plaintiff's hostile work environment claim.

### B. Gender Discrimination

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).

Where, as here, plaintiff lacks direct evidence of discriminatory intent, she must establish a *prima facie* case of discrimination by establishing that: (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class or treated less favorably than a similarly situated person outside of her protected class. Tennial v. United Parcel Serv., Inc., 840 F.3d 292, 303 (6th Cir. 2016); Laster v. City of Kalamazoo, 746 F.3d 714, 727 (6th Cir. 2014). See also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

If plaintiff establishes a *prima* facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. If defendant does so, plaintiff then must "identify evidence from which a reasonable jury

9

could conclude that the proffered reason is actually a pretext for unlawful discrimination." Tennial, 840 F.3d at 303 (internal quotation marks omitted).

Steak n Shake challenges the third element of plaintiff's *prima facie* claim. An adverse employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). "Adverse employment action 'requires an official act of the enterprise, a company act.'" Laster, 746 F.3d at 727 (quoting Ellerth, 524 U.S. at 762).

Plaintiff argues that the third element of her claim is satisfied because she was constructively discharged. See Green v. Brennan, __ U.S. __, 136 S.Ct. 1769, 1776-77 (2016) (plaintiff may satisfy the element of an adverse employment action by demonstrating that she was constructively discharged); see also Laster, 746 F.3d at 727; Kocsis v. Multi–Care Mgmt. Inc., 97 F.3d 876, 885 (6th Cir. 1996). "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Laster, 746 F.3d at 727 (internal quotation marks omitted).

To establish a constructive discharge theory, plaintiff must show that: (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit and (3) she actually resigned or quit. Id. at 727-28; Savage v. Gee, 665 F.3d 732, 739 (6th Cir. 2012).

Factors to consider in determining whether intolerable working conditions existed include: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under an unfavorable supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. Logan v. Denny's, Inc., 259 F.3d 558, 569 (6th Cir. 2001); Saroli v. Automation and Modular Components, Inc., 405 F.3d 446, 451 (6th Cir. 2005).

The court finds that there are genuine issues of material fact which preclude summary judgment as to plaintiff's constructive discharge claim. Corbin testified that she suffered verbal harassment for her entire tenure at the store and experienced up to five incidents of physical contact over the course of a month. Corbin claims that she confronted Simon about the harassment immediately after she heard McCann make the "nice view" remark about her to Simon. When Simon and Steak n Shake refused to address her complaints of sexual harassment, Corbin reached the point

where she felt that she could not work at Steak n Shake anymore. She then notified Steak n Shake to take her off the regular work schedule, and Simon treated her notice as a resignation.

Viewing the evidence in a light most favorable to plaintiff, a jury could find that a reasonable person would have perceived the working conditions as intolerable. Corbin, a minor, testified that the harassment "just didn't ever stop" and her employer did not respond to her complaints. Defendants argue that there is no evidence to suggest that Steak n Shake deliberately created the conditions or intended to force her to quit. But here again the court finds that genuine issues of fact exist.[4] Corbin testified that Simon acted like McCann's "nice view" remark was "no big deal" and even laughed. Corbin Dep. at 65. Simon refused to believe her complaint of harassment and was quick to discredit her, claiming that she had no proof even though he had just heard McCann make a remark about her. Id. at 66, 74. According to Corbin, Simon would not offer to help resolve her situation because he was trying to protect McCann, who was under some disciplinary status stemming from a prior incident of harassment. Id.

Accordingly, the court denies the motion for summary judgment as to plaintiff's gender discrimination claim.

### C. Retaliation

An employer may not retaliate against an employee because she has opposed any practice made unlawful by Title VII. See 42 U.S.C. § 2000e–3(a). "The term 'oppose,' being left undefined by the statute, carries its ordinary meaning, 'to resist or antagonize [. . .]; to contend against; to confront; resist; withstand.'" Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 555 U.S. 271, 276, (2009) (citing Webster's New International Dictionary 1710 (2d ed. 1958)). Complaints to management about "potential violations of Title VII constitute protected activity for purposes of establishing a *prima facie* case of retaliation." Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc., 495 Fed. App'x 651, 655 (6th Cir. 2012).

A Title VII retaliation claim follows the same burden-shifting analysis as a discrimination claim does. See Laster, 746 F.3d at 730. Plaintiff must establish a *prima facie* case of retaliation by

---

[4] Because the sexual harassment came from coworkers and not from Corbin's superiors or managers, the court examines defendants' actions after the point Corbin allegedly reported the harassment to Simon. See Vance, 570 U.S. at 424 (employer's liability under Title VII for harassment depends "on the status of the harasser"); Faragher v. City of Boca Raton, 524 U.S. 775, 802-04 (1998) (discussing the contours of an employer's vicarious liability for harassment); Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 338 (6th Cir. 2008) (employer not liable until it knew or should have known of harassment by coworker).

demonstrating that: (1) she engaged in activity protected by Title VII; (2) her exercise of protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. Id.

The burden of establishing a materially adverse employment action is "less onerous in the retaliation context than in the anti-discrimination context." Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595-96 (6th Cir. 2007). "To establish the third element of the prima facie Title VII retaliation claim, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Laster, 746 F.3d at 731 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

Plaintiff alleges she engaged in protected activity when she reported the sexual harassment to Simon and the corporate hotline. She claims that Simon retaliated by removing her from the work schedule, such that she was unable to clock in on April 2.

The court finds that defendants are entitled to summary judgment on the retaliation claim. Plaintiff's theory is incongruous. Corbin notified Simon that she wanted to be taken off the regular work schedule, and he honored her request. That is, Simon took her off the work schedule because she wanted to be, not because she complained of harassment. While the sequence of events supports her constructive discharge claim – underpinned by the theory that defendants refused to address Corbin's complaints of harassment, leading her to feel compelled to notify Simon that she could not work there anymore – it does not support a retaliation claim. Corbin's testimony highlights this flaw. When Corbin was asked to describe how Simon retaliated against her, she conceded, "Wouldn't say he necessarily, like, retaliated. . . . I don't know how to explain 'retaliated.' Because he wasn't necessarily retaliating against me. He just, like, didn't believe me." Corbin Dep. at 74.

## IV. Conclusion

Accordingly, defendants' motion for summary judgment (doc. 26) is granted as to plaintiff's retaliation claim, and denied as to plaintiff's hostile work environment and gender discrimination claims.

s/ James L. Graham<br>
JAMES L. GRAHAM<br>
United States District Judge

DATE: August 21, 2019