IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Hannah Corbin,

    Plaintiff,

v.

Steak n Shake, Inc.,

    Defendants.

Case No: 2:17-cv-1043

Judge Graham

Magistrate Judge Deavers

## Opinion and Order

This matter is before the Court on two post-trial motions. Plaintiff Hannah Corbin moves for an award of attorneys' fees, costs and prejudgment interests on the grounds that she is a prevailing party. Defendant Steak n Shake, Inc. moves under Federal Rule of Civil Procedure 59 to alter or amend the judgment to remit the jury's award of punitive damages.

**I.  Background**

Corbin, a former Steak n Shake employee in Newark, Ohio, brought this gender discrimination action under Title VII of the Civil Rights Act of 1964 and parallel state law. See 42 U.S.C. §§ 2000e-2, 2000e-3; O.R.C. § 4112.02. Corbin alleged that she was subjected to severe and pervasive sexual harassment and that she was constructively discharged as a result of the harassment. The complaint asserted three causes of action: hostile work environment, gender discrimination and retaliation.

Steak n Shake moved for summary judgment, which the court denied in part and granted in part. The motion was denied as to the hostile work environment and gender discrimination claims, but was granted as to the retaliation claim. See Doc. 33.

The case proceeded to a jury trial, which lasted five days in October 2019. The jury returned a verdict in favor of plaintiff on her claim of sexual harassment by a co-worker and awarded her $308 in back pay and $1000 in compensatory damages for mental and emotional distress. The jury

returned a verdict in favor of defendant on the claims of sexual harassment by a supervisor[1] and gender discrimination. The jury awarded plaintiff $50,000 in punitive damages.

## II. Plaintiff's Motion for an Award of Attorneys' Fees, Costs and Prejudgment Interest

### A. Attorneys' Fees

Plaintiff seeks $273,680.75 in attorneys' fees and argues for the application of a multiplier of 2.0 for success obtained, which would produce a fee award of $547,361.50. Three attorneys billed on this matter, plus two law clerks who had graduated from law school but had not yet been licensed to practice law in Ohio. Plaintiff argues that the expertise and experience of counsel and the excellent results achieved justify an amount that, at first glance, appears extremely high. Defendant argues that the court should exercise its discretion to reduce the rates and hours set by plaintiff's counsel to arrive at an attorneys' fees award of $59,937.

#### 1. Lodestar Method

Under Title VII, the court in its discretion may allow the prevailing party a reasonable attorneys' fee. 42 U.S.C. § 2000e-5(k). It is undisputed that Corbin is a prevailing party. The claim for which the jury found in her favor – that a co-worker sexually harassed her and subjected her to a hostile work environment – was the focal point of her case. See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) ("[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.").

The Court uses the lodestar method in determining a reasonable attorneys' fee. This method multiplies a reasonable hourly rate by the number of hours reasonably expended on the litigation. Because of its objectivity, "there is a strong presumption that the lodestar figure is reasonable." Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 554 (2010). The reasonable hourly rate should be determined according to "the 'prevailing market rate[s] in the relevant community.'" Adcock-Ladd v. Sec'y of Treasury, 227 F.3d 343, 350 (6th Cir. 2000) (quoting Blum v. Stenson, 465 U.S. 886, 895 (1984)). The reasonable number of hours will not include "hours that are excessive, redundant, or otherwise unnecessary." Hensley, 461 U.S. at 434. The lodestar method is designed to attract

---

[1] During trial the parties stipulated to the dismissal of the claims against defendant Michael Simon, who was Corbin's supervisor. Plaintiff agreed to this upon defense counsel's representation that Steak n Shake would be responsible for any damages awarded if the jury returned a verdict for plaintiff on her claim of harassment by a supervisor.

2

competent counsel to vindicate a person's constitutional rights but is not designed to serve as a windfall for attorneys. Coulter v. Tenn., 805 F.2d 146, 149 (6th Cir. 1986).

### 2. Reasonable Hourly Rates

Plaintiff's affidavits and itemized billing statements show that three attorneys employed by the Spitz Law Firm billed on this matter. The two attorneys who tried the case to the jury, Brian Spitz and Matthew Bruce, billed the great majority of the hours (524.5 out of 669.25 total hours). Mr. Spitz, the founder and owner of the firm, has been in practice for 22 years, and he seeks an hourly rate of $550. Mr. Bruce has been in practice for 11 years and seeks an hourly rate of $475. A third attorney, James Hux, billed just 3.5 hours at an hourly rate of $325.[2]

"A trial court, in calculating the reasonable hourly rate component of the lodestar computation, should initially assess the prevailing market rate in the relevant community." Adcock-Ladd, 227 F.3d at 350 (internal quotation marks and emphasis omitted). The court looks to the rate "which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court." Id.

The parties recognize that this Court in past cases has relied on the hourly rates listed in the Ohio State Bar Association's report entitled *The Economics of Law Practice in Ohio in 2013*. See, e.g., Hines v. DeWitt, No. 2:13-cv-1058, 2016 WL 2342014 at *3 (S.D. Ohio May 4, 2016), *aff'd sub nom.* Hines v. City of Columbus, 676 Fed. App'x 546 (6th Cir. 2017). The OSBA Report contains reported rates for attorneys, broken down by type of practice area, geographic region, and years of experience, among other categories. In determining the prevailing market rate, the trial court may also consider an attorney's own normal billing rates and the court's experience and knowledge of the relevant legal community. See Hadix v. Johnson, 65 F.3d 532, 536 (6th Cir. 1995).

In Hines, the Court found that the rate of $350 per hour was a reasonable rate in Central Ohio for a civil rights attorney with more than 20 years of experience. See 2016 WL 2342014 at *3. The Court arrived at that determination based on the OSBA Report and the Court's experience, knowledge and its impression of counsel. See id. at *4 ("$350 per hour is the median rate for civil-rights attorneys in Ohio, and the Court is confident that the median attorney in that survey would be competent to undertake this litigation.").

---

[2] The Court will separately address in Part II.A.3.d the billing entries of the firm's two law clerks, who billed the remaining 141.25 hours.

3

Mr. Spitz seeks an hourly rate of $550. He argues that his 22 years of experience should qualify him for a rate that is well above the median rate of $350 for civil rights attorneys in Ohio. He further argues that the rates found in the OSBA Report should be adjusted for inflation.

The Court, however, finds that the rate of $350 per hour remains appropriate and will apply that rate to Mr. Spitz's hours. The Court makes its finding based in part on the median rates reported by the OSBA Report for the following categories: the Central Ohio market ($200), lawyers with 16 to 25 years of experience ($200), firms like the Spitz firm with 11 to 20 lawyers ($250), and the civil rights practice ($350). The Court too has weighed the range reported for the civil rights practice (with the 25th percentile charging $300 per hour and the 75th percentile charging $500), the mean for the civil rights practice ($412), and the fact that 7 years have elapsed since the OSBA Report was issued. The Court has also considered its own experience with fee disputes and familiarity with the local legal market, its impression of counsel during trial, and its view that this civil rights action was a relatively uncomplicated one. The Court further notes that United States District Judge James Gwin found, albeit in the Northern District of Ohio, that Mr. Spitz's proposed hourly rate of $550 was "unrepresentative of the Cleveland legal market" and instead awarded him $350 per hour. See Wilson v. Prime Source Healthcare of Ohio, No. 1:16-cv-1298, 2018 WL 3730560 at*1 (N.D. Ohio Apr. 10, 2018).

With respect to Mr. Bruce, who has been in practice for 11 years and seeks an hourly rate of $475, the court finds that $275 per hour is a reasonable rate. The Court makes this determination based on the rates listed in the OSBA for associates and for attorneys with 11 to 15 years of experience, as well as the court's experience, impression of counsel and view of the straightforward nature of the case.

James Hux, who is no longer at the Spitz firm, billed 3.5 hours at an hourly rate of $325. The Court will not include Mr. Hux's time in the fee award. The billing entries reflect that Mr. Hux worked on pre-litigation matters, starting from 18 months before the suit was filed and ending 8 months before the suit was filed. See Doc. 95-1 at PAGEID 2178-79. Most of his entries were coded as "communicate with client," and the billing entries show that Mr. Hux was not the attorney who drafted the complaint. Id.

### 3. Reasonable Hours Billed

The second part of the lodestar method requires the Court to determine the reasonable number of hours expended. "[T]he prevailing party's lawyer should be the first gatekeeper in this task, exercising the same billing judgment she would with one's client." Hines, 2016 WL 2342014 at

*4 (citing Hensley, 461 U.S. at 434). The Court's focus is on "mixed questions about whether the lawyer used poor judgment in spending too many hours on some part of the case or by unnecessarily duplicating the work of co-counsel." Coulter, 805 F.2d at 151. Hours which are excessive, redundant, or otherwise unnecessary will not be counted. Hensley, 461 U.S. at 434. While representation by multiple legal counsel "can be productive," "the danger of duplication [is] a waste of resources which is difficult to measure." Coulter, 805 F.2d at 151-52.

Mr. Spitz billed 231.9 hours and Mr. Bruce billed 292.6 hours. Mr. Bruce handled the litigation himself until the case appeared likely go to trial. He was the only attorney who billed in this matter from the filing of the complaint in November 2017 through a September 16, 2019 mediation, which occurred one month before trial.[3] By that point in mid-September 2019, the Court had issued its August 21, 2019 Opinion and Order denying summary judgment in part and conducted the August 30, 2019 final pretrial conference.

### a. From the Start of the Suit through Mediation

Mr. Bruce billed 111.07 hours from the start of the lawsuit in November 2017 through the September 16, 2019 mediation. His hours included drafting the complaint, conducting written discovery, taking the depositions of plaintiff Hannah Corbin and defendant Michael Simon, preparing affidavits for witnesses Maddie Dean and Shannon Morlen, responding to defendant's motion for summary judgment, preparing a final pretrial order, attending the final pretrial conference, exchanging settlement demands and attending the September 16 mediation before the magistrate judge. Mr. Bruce billed 85.82 hours for these services. The remainder of the time, 25.25 hours, was billed in entries coded as "communicate" with either the "client," "outside counsel" or an "external" third party.

Defendant objects only to the time entries marked "communicate." With respect to the 85.82 hours of legal services provided, defendant raises no objections to the necessity of the services or reasonableness of the time spent by Mr. Bruce. Upon review of the billing entries and considering the nature of the case, the Court finds that Mr. Bruce's billing of 85.82 hours for this phase of the litigation was reasonable. Applying the rate of $275 per hour to 85.82 hours yields $23,600.50. The Court finds this amount to be reasonable for compensating a competent attorney to commence civil rights litigation, conduct a moderate amount of discovery, defend the case against

---

[3] Mr. Spitz had two billing entries in May 2017, pre-dating the filing of suit by six months. These entries were coded "communicate with client" and totaled 0.28 hours. See Doc. 95-1 at PAGEID 2179. The Court will exclude these two entries from the fee award.

a motion for summary judgment, and prepare for and attend the final pretrial conference and court-supervised mediation.

With respect to the "communicate" time entries totaling 25.25 hours, the Court does not doubt that effective communication is a critical skill for any lawyer. But, as defendant argues, these time entries suffer from being excessive and often representing routine tasks (such as scheduling) which a non-lawyer could have performed. The Court will exclude these time entries from the fee award.

### b. After the Mediation to the End of Trial

The Court now turns to the time entries from the day after the mediation to the end of the trial: September 17 through October 21, 2019. This phase marks Mr. Spitz's involvement in the case and covers late pretrial matters like motions in limine, proposed jury instructions and trial preparation, as well as the trial itself. Mr. Spitz billed 225.9 hours and Mr. Bruce billed 181.45 hours.

Defendant objects that the number of hours billed is excessive and that many of the time entries are too vague to ascertain the nature of the services performed. Plaintiff responds that defendant wants plaintiff's counsel punished for "working too hard." Plaintiff cites cases recognizing that attorneys work long hours during the trial stage and also cites defendant's admission that its legal counsel billed more hours than plaintiff's counsel did. See Communities for Equity v. Michigan High Sch. Athletic Ass'n, No. 1:98-CV-479, 2008 WL 906031 at *15 (W.D. Mich. Mar. 31, 2008); Doc. 96.

The Court has closely examined the billing entries for plaintiff's counsel during the trial phase and makes the following determinations. Mr. Bruce billed a total of 11.28 hours for entries marked "communicate." These entries will be excluded as excessive, duplicative, vague and reflecting routine tasks which a non-lawyer could have performed.

Mr. Spitz billed 0.22 hours on September 18, 2019 for "scheduling issues" with plaintiff's medical expert. The Court will exclude this entry as reflecting a routine task.

The Court includes in the fee award 0.5 hours billed by Mr. Bruce on September 24, 2019 regarding documents produced late by Dick's Sporting Goods. These documents were relevant to back pay damages, as Corbin's next job after Steak n Shake was at Dick's. However, Mr. Spitz's time on the same matter, 0.13 hours, is excluded as duplicative.

Mr. Bruce billed 14.17 hours and Mr. Spitz billed 3.47 hours on motions in limine. Plaintiff filed two motions in limine and defendant filed one. None of the motions raised novel or particularly complex issues, and the briefs were short. The entries show that Mr. Spitz's work

6

duplicated the effort of Mr. Bruce, and his time is thus excluded. The Court also finds that Mr. Bruce's time is excessive and should be capped at 8 hours.

Mr. Bruce billed 8.75 hours on jury instructions. Again, the claims were relatively uncomplicated ones and pattern instructions were available. The Court will cap Mr. Bruce's billing on jury instructions at 5 hours.

Mr. Spitz billed 9.41 hours under the code "review/analyze." The accompanying descriptions for the entries reveal that these hours reflect the time spent by Mr. Spitz, who was not previously involved, to learn the case. The Court finds that that a paying client would not tolerate this inefficiency and these hours are excluded.

The next category of billing entries relate to trial preparation from October 2 to October 14, 2019, the day before the start of trial. Mr. Spitz billed 115.06 hours and Mr. Bruce billed 63.58 hours. The entries include review of deposition transcripts and other documents, preparation of direct and cross examination questions, and preparation for jury selection and opening argument. Other entries, especially those for Mr. Bruce, contain no further description ("other trial preparation and support"). Defendant objects that the trial preparation hours and entries must be reduced as excessive, duplicative and vague.

In Hines, the Court was confronted with a somewhat similar situation. There, the attorney who tried the case to the jury was not involved until late in the litigation. The attorney billed, over a 12 day period, 85.75 hours for trial preparation. The Court reduced these hours by 75% (to 21.4 hours) because of the inefficiency caused by the attorney's previous lack of involvement. See Hines, 2016 WL 2342014 at *5.

The Court finds that the same reduction of 75% is appropriate here for Mr. Spitz's hours related to trial preparation. The Court will allow 28.77 hours for Mr. Spitz.

With respect to Mr. Bruce, several of his trial preparation entries lack a description. The Court will exclude these vague entries, which total 25.58 hours. This leaves 38 hours of trial preparation, which the Court finds is still excessive in light of the number of hours which Mr. Spitz put into trial preparation and the fact that Mr. Spitz would take the lead at trial. The Court will reduce Mr. Bruce's remaining hours by one-third, which leaves a total of 25.33 hours allowed for Mr. Bruce for trial preparation.

The final billing entries for the trial phase span from the first day of the trial, Tuesday, October 15 to the final day, Monday, October 21, 2019. The entries include ones marked "trial attendance" on the five trial days and ones marked "trial preparation" during the weekend of

October 19 and 20, 2019.  Mr. Spitz billed 97.61 hours during this span and Mr. Bruce billed 83.17 hours.  During the trial attendance days, the pair each billed from 14.25 to 17.37 hours per day.

Defendant contends that the trial attendance hours should be limited to 14 hours per day for each attorney.  Defendant does not object to the weekend hours that were billed (13.81 total hours by Mr. Spitz and 8 hours by Mr. Bruce).

In the Court's view, it is reasonable to cap the daily hours on trial days at 12 hours per attorney.  While "[i]t is not unusual for a law firm to use two attorneys at trial," James v. Frank, 772 F. Supp. 984, 1001 (S.D. Ohio 1991), the Court must reiterate that this was a relatively simple case.  Plaintiff called six witnesses at trial, including herself, her parents and a close friend.  The testimony of her medical expert was presented as a previously-conducted video deposition.  Though defendant called thirteen witnesses, the testimony of several of those witnesses was relatively short.  For six of defendant's witnesses, plaintiff's cross examination lasted just a few minutes.  Moreover, the Court did not operate protracted hours in the courtroom – the number of hours spent in court over the five trial days totaled 38.5 hours, or slightly less than an average of 8 hours per day.

Thus, the Court will allow 12 hours per attorney for each of the five trial days.  The Court finds that the weekend hours spent by Mr. Spitz and Mr. Bruce were reasonable and will allow those hours.  Counsel spent this time preparing for the final witnesses and closing argument, as well as preparing a bench memorandum on a number of legal issues which the Court required the parties to submit over that weekend.  See Doc. 79.

In sum for the phase of litigation covering from the day after mediation through the end of the jury trial, the Court allows 102.58 hours for Mr. Spitz (28.77 hours for trial preparation plus 73.81 hours during trial).  Multiplying this number of hours by the hourly rate of $350 results in $35,903.00.  The Court allows 106.83 hours for Mr. Bruce during this phase (0.5 hours for review of the Dick's Sporting Goods documents; 8 hours for motions in limine; 5 hours for jury instructions; 25.33 hours for trial preparation; and 68 hours during trial).  Multiplying these hours by the hourly rate of $275 results in $29,378.25.

### c. Post-Trial

Following trial, Mr. Spitz billed 5.3 hours in connection with plaintiff's motion for fees and costs.  The Court may award fees for "time spent in preparing, presenting, and trying attorney fee applications."  Coulter, 805 F.2d at 151.  Generally the number of hours for preparing a fee petition should not exceed 3% of the hours in the main case.  Gonter v. Hunt Valve Co., 510 F.3d 610, 620 (6th Cir. 2007); Coulter, 805 F.2d at 151.

The Court has allowed 295.23 hours for the main case. The 5.3 hours spent on the fee petition easily falls below the 3% mark, and the Court will therefore allow these hours.

The Court, however, will disallow an entry marked "communicate" by Mr. Bruce for 0.33 hours spent on October 24, 2019 for sending an email to a court reporter.

### d. Law Clerk Hours

The Spitz firm had two law clerks who had graduated from law school and were awaiting their bar exam results. Their billing entries ran from October 4, 2019 to October 30, 2019 and totaled 141.25 hours. The Spitz firm charged a rate of $75 per hour for their services.

Plaintiff argues that it was cost-effective to delegate certain tasks, like legal research and preliminary drafting, to the law clerks. Defendant does not contest the proposed hourly rate but argues that the number of law clerk hours should be significantly reduced because law clerks are bound to be inefficient.

Upon review of the entries related to the law clerks, the Court finds that the defendant has the better of this argument. To provide a few examples, 18.5 hours were billed on a single motion in limine regarding plaintiff's marijuana use; 37.35 hours were billed on preparing a bench brief; and 35.75 hours were billed on the fee petition.

The Court finds that the hours billed by the law clerks are excessive and to some degree duplicative of the hours billed Mr. Spitz and Mr. Bruce. The Court will thus reduce the law clerk hours spent on the fee petition to 3.5 hours, so that combined hours for the fee petition do not exceed 3% of the main case. The remainder of the law clerk hours (105.5) will be reduced by 75%, such that 26.38 of these hours are allowed. The Court finds that the proposed rate of $75 per hour for the law clerks is reasonable. See Howe v. City of Akron, No. 5:06-CV-2779, 2016 WL 916701 at *9 n.13 (N.D. Ohio Mar. 10, 2016), aff'd, 705 Fed. App'x 376 (6th Cir. 2017) (approving rate of $90 per hour for law clerks).

### 4. Summary of Approved Lodestar Rates and Hours

The Court allows 107.88 hours for Mr. Spitz at the hourly rate of $350. His portion of the lodestar amount is $37,758.00.

The Court allows 192.65 hours for Mr. Bruce at the hourly rate of $275. His portion of the lodestar amount is $52,978.75.

The Court allows 29.88 hours for the law clerks at the hourly rate of $75. This portion of the lodestar amount is $2,241.00.

The total lodestar amount is $92,977.75.

### 5.     Multiplier v. Across-the-Board Reduction

Both parties correctly argue that the Court must consider the degree of success obtained by plaintiff in determining a final fee award.  See Hines v. City of Columbus, 676 Fed. App'x at 556 ("[A] trial court abuses its discretion when it does not consider the relationship between the fee awarded and the success obtained.") (emphasis omitted).  But the parties have starkly opposing views of plaintiff's success.

Plaintiff argues that the results obtained at trial, in addition to other considerations, justify a multiplier of 2.0 times the lodestar amount.  Multipliers, or fee enhancements to the lodestar amount, "are permissible in some cases of 'exceptional success.'"  Barnes v. City of Cincinnati, 401 F.3d 729, 745 (6th Cir. 2005) (quoting Blum v. Stenson, 465 U.S. 886, 895 (1984)).  "The key issue is whether an adjustment is necessary to the determination of a reasonable fee."  Id.  The trial court may consider the following twelve factors in connection with applying a multiplier:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Id. (quoting Blanchard v. Bergeron, 489 U.S. 87, 91 n.5 (1989)).  The most important of these factors is the degree of success obtained.  See Hensley, 461 U.S. at 436.

Plaintiff argues that the jury verdict represents exceptional success.  The jury awarded plaintiff, a low-level employee earning a meager hourly salary, $308 in back pay, $1000 in compensatory damages and $50,000 in punitive damages.  Plaintiff argues that proving sexual harassment is difficult and depended on persuading the jury of the credibility of plaintiff's witnesses.  Plaintiff also emphasizes that litigating the case required a significant amount of time and labor, as evidenced by counsel's billing entries, and that the result obtained is due at least in part to the skill of plaintiff's counsel.  Finally, plaintiff notes that this case was taken on a contingency fee basis.

Defendant responds that a fee multiplier should be applied only in rare cases and that this was not a complicated, high-stakes case like the ones where multipliers are sometimes awarded.  See, e.g., Lowther v. AK Steel Corp., No. 1:11-cv-877, 2012 WL 6676131 at *5 (S.D. Ohio Dec. 21, 2012) (applying multiplier in ERISA class action where class counsel negotiated a recovery of over $100 million).  Defendant believes that plaintiff did not enjoy much success, which justifies a one-

third reduction in the fee award.  See Clark v. Shop24 Glob., LLC, No. 2:12-cv-802, 2016 WL 5533585 at *4 (S.D. Ohio Sept. 30, 2016) ("When attorneys' fees far exceed damages, 'the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended' must be the focus of the Court's attention.'") (quoting Dean v. F.P. Allega Concrete Const. Corp., 622 Fed. App'x 557, 559 (6th Cir. 2015)).  Defendant points out that plaintiff's retaliation claim was dismissed at summary judgment and that the jury rendered a verdict in defendant's favor on her claims of sexual harassment by a supervisor and gender discrimination.  In addition, defendant emphasizes that the amount awarded for back pay and compensatory damages was just 26% of defendant's final settlement offer of $5000.

The Court finds that the circumstances do not justify a fee multiplier, nor do they warrant a fee reduction.  The case was not complicated: a one plaintiff suit alleging sexual harassment by a co-worker for nine months at a single Steak n Shake store.  It did not raise novel or difficult questions, nor did it require exceptional skill, time or labor on the part of plaintiff's counsel.

Success in this case was in the eye of the beholder.  Defendant is right that plaintiff did not achieve success on several of her claims.  But she did prevail on the co-worker harassment claim at the heart of her case.[4]  Plaintiff is right that she was vindicated by the jury verdict finding defendant liable for co-worker harassment.  But the $1,308 back pay and compensatory damage award was a modest recovery, at best.  The $50,000 punitive damages award is what made plaintiff's recovery significant in monetary terms.

One additional consideration confirms that neither a multiplier nor a reduction are appropriate.  A court may evaluate the degree of success in light of the parties' settlement positions.  See Hines v. City of Columbus, 676 Fed. App'x at 556 ("Considering a rejected settlement offer is

---

[4] Because the co-worker harassment claim was factually and legally related to the claims which failed, the Court declines to impose a fee reduction based on the number of failed claims.  Where a plaintiff succeeds on only some claims, a court should ask: "did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded?"  Hensley, 461 U.S. at 434  Work on an unrelated and unsuccessful claim "cannot be deemed to have been "expended in pursuit of the ultimate result achieved." Id. at 435 (internal quotation marks omitted).

Plaintiff's supervisor harassment claim was based on her assertion that defendant Simon was present during an episode of co-worker harassment and that he joined in by making an offensive remark.  Her gender discrimination claim alleged that she felt compelled to quit her job because the co-worker harassment made her working conditions intolerable.  And her retaliation claim asserted that she was removed from the work schedule because she reported the co-worker harassment to Simon and a corporate hotline.

11

one way of measuring the degree of success."). Plaintiff's final settlement demand was $85,000; defendant made a final offer of $5,000. Defendant best predicted the value of plaintiff's case when not considering punitive damages, while plaintiff best predicted the overall recovery. But even then, the overall recovery cannot be described as a resounding success for plaintiff, as it came in nearly $34,000 below her settlement demand.

In sum, the jury's verdicts were a mixed bag. Both sides likely left the courthouse feeling some measure of success, offset by a measure of failure. In such a case, the Court declines to adjust the lodestar amount based on the degree of success obtained. The lodestar amount of $92,977.75 makes for a satisfactory and reasonable fee award based on the outcome of the case.

Accordingly, plaintiff is awarded $92,977.75 in attorneys' fees.

### B. Costs

Plaintiff next seeks an award of costs of $9,316.41. The costs include fees for the filing of the complaint, deposition transcripts, travel and copying. See 28 U.S.C. § 1920; Waldo v. Consumers Energy Co., 726 F.3d 802, 827 (6th Cir. 2013).

Defendant does not contest the inclusion of these types of costs, nor does it challenge the reasonableness of the amount sought.

Accordingly, plaintiff is awarded $9,316.41 in costs.

### C. Prejudgment Interest

Plaintiff lastly seeks an award of prejudgment interest on the $51,308 verdict. Plaintiff expressly makes this request solely under Ohio law, not under Title VII.

Prejudgment interest is available in a civil action based on tortious conduct "in which the court has rendered a judgment, decree, or order for the payment of money," if the court determines that "the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case." O.R.C. § 1343.03(C)(1).

The key question in most cases is whether the party who lost made a good faith effort to settle the case. The Ohio Supreme Court has held that a party has not "failed to make a good faith effort to settle" if he has: "(1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party." Kalain v. Smith, 25 Ohio St. 3d 157, 159, 495 N.E.2d 572, 574 (Ohio 1986).

12

Plaintiff argues that defendant repeatedly failed to cooperate during discovery and failed to make a good faith offer. The Court finds no support in the record for these broad assertions.

Plaintiff accuses defendant of "repeatedly" refusing to cooperate in discovery. Doc. 85 at p. 19. But the only discovery dispute brought to the Court's attention was not until the eve of trial, during an October 11, 2019 telephone conference. Plaintiff objected that an item on defendant's amended trial exhibit list (attendance records) should have been produced in response to earlier discovery requests. The Court determined that plaintiff never requested a certain portion of the records (relating to employees who gave witness statements during Steak n Shake's investigation of plaintiff's accusations) because plaintiff felt at the time that they were not relevant. The Court finds that the October 11 discovery dispute does not represent a failure to fully cooperate by defendant, nor was it the type of discovery problem which prevented the parties from rationally evaluating their risks and liability.

The Court must also reject the characterization that defendant failed to make a good faith monetary offer. Defendant initially offered $2,500 and made a final offer of $5,000. Both of these amounts exceeded what the jury awarded plaintiff in back pay and compensatory damages. That defendant incorrectly assessed that punitive damages would not be awarded does not mean that it failed to make a good faith effort to settle. Cf. Kalain, 25 Ohio St. 3d at 159, 495 N.E.2d at 574 ("If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer.").

Further, the Court notes that defendant and plaintiff jointly requested that the Court refer the case to the magistrate judge for mediation. The Court granted the request, and it is the Court's impression that defendant conducted itself in good faith in participating in the mediation.

Accordingly, plaintiff's motion for prejudgment interest is denied.

### III. Defendant's Motion to Remit Punitive Damages

#### A. Standard

Defendant moves to alter or amend the judgment to remit the punitive damages verdict. Fed. R. Civ. P. 59(e). A trial court may remit a verdict "only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court." Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc., 416 F.3d 505, 509 (6th Cir. 2005) (internal quotation marks omitted).

The jury awarded plaintiff $50,000 in punitive damages, $308 in back pay and $1,000 in compensatory damages. Defendant argues that the ratio of 38 to 1 of punitive damages to back pay and compensatory damages is so excessive that it violates defendant's right to due process under the Fifth Amendment to the United States Constitution. In support, defendant cites State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003), which stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Defendant moves to reduce the punitive damages award to $5,232, so the ratio of punitive damages to compensatory damages is 4 to 1.

The Court looks to three "guideposts" in determining whether a punitive damages award is so excessive as to offend due process: "the degree of reprehensibility of the defendant's conduct, the punitive award's ratio to the compensatory award, and sanctions for comparable misconduct." Romanski v. Detroit Entm't, L.L.C., 428 F.3d 629, 643 (6th Cir. 2005) (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 576-84 (1996)).

### B. The Degree of Reprehensibility of Defendant's Conduct

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, 517 U.S., at 575. In evaluating the reprehensibility of defendant's conduct, a court considers whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." State Farm, 538 U.S. at 419.

Viewing the evidence in the light most favorable to the awardee, the Court finds that defendant's conduct was reprehensible. The most compelling evidence in support of this conclusion was the vulnerability of plaintiff and another young female employee at the Newark Steak n Shake store. Plaintiff was a minor, 17 years old, working an entry-level position as a server. See Trial Transcript, Vol. II, p. 174. The sexual harassment was committed primarily by an adult male co-worker (Will McCann), who was in his mid-twenties and held a position of higher authority in the store. See id., pp. 389-91. Other young adult male co-workers (Logan Brown, Forrest Priest, Bubba Travis) joined in the harassment and failed to prevent or report McCann's conduct. See id. at pp. 395, 398, 408-09. Plaintiff was aware at the time that another minor female (Maddie Dean) had experienced similar harassment. See id. at pp. 403-05. The harassment included verbal harassment, as well as physical, sexual touching out of view of customers or other co-workers. See id., pp. 398-

14

99, 410-11.  Particularly egregious was an incident, of which plaintiff was aware, in which McCann forcibly touched Dean in a walk-in freezer.  See Trial Tr., Vol. I, pp. 76, 99.

Several other factors added to plaintiff's feelings of vulnerability, helplessness and being "scared."  See Trial Tr., Vol. II, p. 404.  The store's management included two adult males (Mike Simon and Shawn McLeish) who, according to plaintiff's evidence, made inappropriate comments directed at plaintiff and refused to stop McCann because of their close relationship with him.  See Trial Tr., Vol. I, p. 95; Trial Tr., Vol. II, pp. 322, 388-89, 407, 409, 410.  Another supervisory employee was McCann's girlfriend (Kayla Dehmann), who refused to believe any of plaintiff's and Dean's reports of harassment.  See Trial Tr., Vol. I, p. 101; Trial Tr., Vol. II, pp. 395, 411.  McCann's mother worked at the store too and verbally lashed out and threatened plaintiff when plaintiff accused her son of harassing her.  See id., pp. 312, 354-56.  Plaintiff's report to the corporate hotline went nowhere.  See id., p. 416.  And Steak n Shake failed to discipline McCann or reassign or remove him from the workplace despite plaintiff's reports of harassment.  See id., p. 317.

In other words, plaintiff's evidence supported a conclusion that defendant operated a store in which plaintiff and another minor female employee were regularly harassed by older male employees and that management condoned the behavior and chose to protect the harasser rather than take action to protect the victims.

Defendant argues that its conduct was not reprehensible because it had zero-tolerance policies and mechanisms in place for employees to report workplace misconduct.  Defendant produced such evidence at trial, but it is clear that the jury was persuaded by plaintiff's evidence that defendant's alleged safeguards completely failed her at the Newark store.  See Tisdale v. Fed. Exp. Corp., 415 F.3d 516, 533 (6th Cir. 2005) (in a Title VII case, rejecting employer's attack on punitive damages where the attack relied on "much evidence in the record in support of its anti-discrimination policies" but the jury found that discrimination had nonetheless occurred).

### C. The Ratio of Punitive Damages to Compensatory Damages

Though a punitive damages award is most likely to comport with due process when it does not exceed a single-digit ratio to compensatory damages, the Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award."  Gore, 517 U.S. at 582.  See also State Farm, 538 U.S. 408 at 425 ("[T]here are no rigid benchmarks that a punitive damages award may not surpass . . . ."); Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18 (1991) ("We need not, and

indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case.").

The Supreme Court in State Farm thus stated that "ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" 538 U.S. at 425 (quoting Gore, 517 U.S. at 582). "A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." Gore, 517 U.S. at 582. See also Argentine v. United Steelworkers of Am., AFL-CIO, 287 F.3d 476, 488 (6th Cir. 2002) (upholding a 42:1 ratio – $400,000 punitive damages award and $9,400 compensatory damages award – where non-physical injuries were "without a ready monetary value").

The Court finds here that the 38:1 ratio of punitive damages to back pay and compensatory damages is within constitutional limits. This case fits the mold of one in which reprehensible conduct produces a small amount of economic harm and produces noneconomic harm which is difficult to quantify. Plaintiff, a high school student at the time, did not work a lot of hours, nor did she earn much of an hourly wage as a server. See Trial Tr., Vol. III, pp. 451-52. She found another job fairly quickly – in about one month – after her employment with Steak n Shake ended. See id., at p. 452. It was no surprise then that the jury awarded plaintiff a mere $308 in back pay.

The jury's modest award of $1000 to plaintiff for mental and emotional distress also was not surprising. Such injury is difficult to quantify, and the jury heard a great deal of evidence concerning other, pre-existing difficulties and points of stress in plaintiff's life. These included family and relationship problems and marijuana use. See Trial Tr., Vol. V, pp. 998-1000.

This case therefore presented a fact pattern of reprehensible conduct which happened to produce a relatively small amount of harm to this particular plaintiff. The Court believes that the $50,000 punitive damages award was meant to send a message to defendant Steak n Shake as a company that it should be punished for its failure to prevent and respond appropriately to sexual harassment of minor female employees at its Newark store.

### D. Sanctions in Comparable Cases

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." Gore, 517 U.S. at 583. A court "should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct." Id. (internal quotation marks omitted).

Title VII imposes caps on combined compensatory and punitive damage awards depending on the size of the defendant. Where a defendant has more than 500 employees, as Steak n Shake does, the cap is $300,000. 42 U.S.C. § 1981a(b)(3)(D). The Sixth Circuit has held that punitive damages are available under Title VII even if only nominal damages were awarded. Morrison v. Circuit City Stores, Inc., 317 F.3d 646, 672 (6th Cir. 2003) (en banc). The Sixth Circuit has further held that held that punitive damages are available under Title VII even when no compensatory or nominal damages were awarded. Tisdale, 415 F.3d at 535.

The $50,00 punitive damages award here fell well below the $300,000 statutory cap. In light of defendant's net worth of $500 to $600 million, see Trial Tr., Vol. V, p. 1065, the punitive damages award does not strike the Court as being unreasonably excessive for the misconduct committed. See Haslip, 499 U.S. at 18 ("[G]eneral concerns of reasonableness . . . when the case is tried to a jury properly enter[s] into the constitutional calculus.").

The award is also in line with Title VII cases where the suit brought to light a workplace situation in which a large employer had engaged in discriminatory conduct but the plaintiff personally suffered relatively little or no compensatory damages. For example, in Tisdale the court upheld a $100,000 punitive damages award against Federal Express, where a jury found for an employee who had complained of racial discrimination at a distribution site but did not award him compensatory damages. 415 F.3d at 534-35. In Jeffries v. Wal-Mart Stores, Inc., the Sixth Circuit upheld a punitive damages award that was 50 times larger than the compensatory damages award in a Title VII case, where the plaintiff reported racial discrimination but had suffered little economic injury. 15 Fed. App'x 252, 266 (6th Cir. 2001).

In sum, the Court finds that the punitive damages award is not so excessive as to offend due process. Defendant's motion to remit is denied.

**IV.     Conclusion**

For the reasons stated above, plaintiff's motion for an award of attorneys' fees, costs and prejudgment interest (doc. 85) is granted in part and denied in part. Plaintiff is awarded $92,977.75 in attorneys' fees and $9,316.41 in costs, but is denied prejudgment interest.

Defendant's motion to alter or amend the judgment to remit punitive damages (doc. 90) is denied.

s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: April 17, 2020

17